UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| HILDA L. SOLIS, Secretary of Labor,<br>United States Department of Labor, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 10 Civ. 5632 (PAE) |
| | ) | |
| -v- | ) | CERTIFICATION OF |
| | ) | SUPERVISED ELECTION |
| | ) | |
| TRANSPORT WORKERS UNION OF<br>AMERICA, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## DECLARATION OF PATRICIA FOX

I, Patricia Fox, am the Chief of the Division of Enforcement, Office of Labor-Management Standards ("OLMS"), United States Department of Labor ("Department"). The Department supervised an election of officers of Defendant Transport Workers Union of America ("Defendant" or "TWU"), which was completed on July 9, 2012, pursuant to a November 23, 2011 Stipulation and Order issued by this Court. Pursuant to this Stipulation and Order, the supervised election also included new elections for delegates, where the Department determined it to be necessary. The positions included in this supervised election included one International Vice President and two International Executive Board Members.

Pursuant to paragraph 4 of the Stipulation and Order of Settlement entered by the Court on November 23, 2011, this declaration certifies the names of the individuals elected in the supervised election, that the supervised election was conducted in accordance with Title IV of the Labor Management Reporting and Disclosure Act of 1959 (the "LMRDA" or the "Act"), and, insofar as was lawful and practicable, that the supervised election was conducted in

accordance with the TWU Constitution.  Specifically, this declaration describes the supervised election, including the process by which OLMS certified delegates from TWU local unions participating in the supervised election and the election of the three TWU officers.  This declaration also summarizes the protests received by OLMS in connection with the supervised election, and OLMS's review of those protests.

On December 21, 2011, OLMS mailed a Pre-Election Conference invitation to TWU local unions and also emailed this invitation to local union email addresses provided by TWU.  The purpose of the Pre-Election Conference was to develop election rules and procedures and to establish timeframes to be used in conducting the supervised election.  Further, the conference established rules and procedures for conducting the local delegate elections, where necessary.

The Pre-Election Conference was held on January 10, 2012 at the OLMS New York District Office (201 Varick Street, Room 841, New York, NY 10014) at 10:00 a.m.  Because OLMS was supervising the new election of three International Officers that were previously elected by TWU local delegates at its 2009 International Convention, TWU local unions across the country were invited to participate in the Pre-Election Conference by telephone.  The conference was open to all interested parties.

Bennett Allen, an OLMS investigator designated as the Election Supervisor, had the authority and responsibility for implementing all aspects of the supervised election.  At the January 10, 2012 Pre-Election Conference, the Election Supervisor advised attendees that the Department was responsible for assuring the conduct of a fair election under the Labor-Management Reporting and Disclosure Act of 1959 and, insofar as lawful and practicable, in accordance with provisions of the TWU International Constitution and Bylaws.  The Election Supervisor explained the rules of the supervised election, including nominations, candidate

eligibility requirements, campaigning rules, election procedures for voter eligibility, timeframes for conducting various aspects of the supervised election, and protest procedures. On January 18, 2012, OLMS sent the "General Rules for Electing Officers in Transport Workers Union" to all Pre-Election Conference attendees and other interested parties.

Between January 17 and May 31, 2012, the Election Supervisor worked with 18 OLMS district offices throughout the country to certify that all delegates from each TWU local were properly elected and eligible to participate in the supervised election of International Officers. To determine whether delegates were properly elected, OLMS reviewed dues payment records and local election records. To be eligible to participate in the supervised election, delegates must have had two years of continuous good standing (no late or missed dues payments) and must have shown that they were elected in accordance with the union election rules and the LMRDA. In total, OLMS certified that 394 delegates from 93 of TWU's 106 active local unions were properly elected. Eleven local unions elected not to participate in the supervised election, and two local unions remained uncooperative throughout the election process.

## I.     TWU Local 100 Delegate Election

During the process of certifying local delegates, OLMS concluded that TWU Local 100 was entitled to have 123 delegates participate in the supervised election because the TWU Constitution requires that a local union receive one delegate per 300 members. The delegates for Local 100 are divided over 16 individual divisions. OLMS was only able to certify that 106 delegates were properly elected to participate in the 2009 Convention. Accordingly, a number of Local 100 divisions were left with fewer delegates than they were entitled to under the TWU Constitution. Local 100 members from these divisions voted on whether they wanted to (a)

3

conduct a new supervised election for these open delegate positions or (b) allow only the properly elected delegates participate in the supervised election.

Three Local 100 divisions voted to hold new delegate elections. Among these three divisions, five new delegates were elected. Accordingly, Local 100 had 111 delegates certified to participate in the supervised election.

One of the Local 100 divisions, the Car Maintenance Division, chose to hold a new election, supervised by OLMS, for one open delegate position. Four Local 100 members of the Car Maintenance Division were nominated and accepted the nomination to run for delegate. The election was conducted on May 16, 2012, with Eugene Bleynis winning the last delegate position for the Car Maintenance Division. Bleynis won by a 14-vote margin.

During the Local 100 delegate election for the Car Maintenance Division, OLMS received three pre-election protests dated February 9, April 24, and May 2, 2012, and one post-election protest dated May 21, 2012. All of the protests were filed by Ainsley Stewart, an unsuccessful candidate for the delegate position in the Car Maintenance Division. The substance of the allegations in these protests is summarized below, followed by the Department's resolution of each allegation.

A.    Ainsley Stewart's pre-election protest dated February 9, 2012

Allegation: Stewart alleged that it was unfair to list the names of candidates in alphabetical order by last name on the ballot. Stewart argued that candidates' names should be listed in alphabetical order by first name. He also argued that OLMS should randomly draw candidates' names for placement on the ballot.

Response: Section 401(c) of the LMRDA prohibits disparate treatment among candidates for union office, and requires that unions provide adequate safeguards to insure a fair

election. *See* 29 U.S.C. § 481(c). A determination as to the position of candidates' names on the ballot may be made in any reasonable manner permitted by the union's constitution and bylaws, consistent with the provisions of the LMRDA. 29 C.F.R. § 452.112. In this case the TWU Constitution does not prohibit listing candidates' last names alphabetically on the ballot. During the January 10th Pre-Election Conference, the Election Supervisor suggested that the ballot should include candidates' last names in alphabetical order. In response, Stewart argued that candidates' names should be listed in alphabetical order by first name. No other member attending the Conference supported Stewart's suggestion; instead, deciding that ballots should include candidates' last names in alphabetical order. The decision to list candidates' last names alphabetically on the ballot was applied equally to all candidates. This was a reasonable election rule, which did not treat any candidate in a disparate manner. There was no violation of the LMRDA.

Allegation: Stewart alleged that election information provided on the TWU website was misleading and false because the posted Election Rules had the heading, "Eligibility to Hold Office" instead of a heading that referred to eligibility to "seek office."

Response: The Department determined that there was no need to distinguish between "holding" and "seeking" office. That is, the eligibility qualifications for holding office are identical to those qualifications for seeking office. The title of this election rule did not mislead union members. There was no violation of the LMRDA.

Allegation: Stewart alleged that TWU did not properly secure election information posted on its website, which might allow someone to tamper with the materials posted. Specifically, Stewart was concerned that a candidate could print or download information from the TWU website, edit the material, and then use the material for campaign purposes.

Response:  The Department did not find any evidence that individuals were manipulating materials found on the TWU website for campaign purposes.  Further, Stewart did not reveal any evidence to establish that a candidate in fact manipulated materials founds on the TWU website.  Even if such actions occurred, however, the LMRDA prohibits unions from regulating the contents of candidates' campaign literature.  *See* 29 C.F.R. § 452.70.  There was no violation of the LMRDA.

B.    Ainsley Stewart's pre-election protests dated April 24, 2012 and May 2, 2012

Allegation:  Stewart alleged that the union violated section 401(g) of the LMRDA by circulating its Spring 2012 newsletter to members, which included an inaccurate statement regarding the union's good standing requirements.  Specifically, Stewart argued that the article written by Local 100 attorney Larry Cary concerning the supervised election inaccurately stated that "[a] payment after the 15th means the member is considered to be in bad standing for the month even though he paid his dues for that month."

Response:  Section 401(g) prohibits the use of union or employer funds to promote or disparage any candidate for union office.  *See* 29 U.S.C. § 481(g).  The Department concluded that Cary's statement in the article is not accurate because a member's failure to pay his or her dues by the 15th of the month only results in the loss of the member's continuous good standing for purposes of being eligible to run for office.  The member would not lose good standing for purposes of voting in the election as a delegate, so long as the member pays the dues later and regains good standing prior to the election.

Regardless, the inclusion of this inaccurate statement in the article does not violate section 401(g).  This statement neither promotes nor disparages any candidate in the election and in no way can be interpreted as campaigning or electioneering.  Further, even if this error

6

constituted a violation, the LMRDA provides that a new election is only ordered where a violation "may have affected the outcome of the election." 29 U.S.C. § 482(c). The Department determined that Cary's statement would not have affected the outcome of the election because during the course of the supervised delegate election, the Department posted the election rules on the TWU website and distributed the rules to members of Local 100. The election rules accurately explained voting requirements and good standing requirements for seeking office. There was no violation affecting the outcome of the election.

Allegation: Stewart alleged that Local 100 violated section 401(g) of the LMRDA by posting a one-page informational flyer that discusses the Department's investigative findings relating to Stewart's election complaint, protesting the 2009 Convention. Specifically, Stewart takes issue with a flyer that Local 100 posted in October 2011 because the flyer identified Stewart by name and stated that the Department's investigation found that his rights were not violated because he made a late dues payment. Stewart argued that this disparaged his candidacy for delegate. Stewart also alleged that the union reposted this flyer at worksites in April 2012, one month prior to the delegate election.

Response: Section 401(g) prohibits the use of union funds to promote or disparage any candidate for union office. *See* 29 U.S.C. § 481(g). The Department reviewed this flyer in light of the applicable legal standard for determining whether a piece of union-funded literature constitutes unlawful campaign material. The Department examines the timing, tone, and content of the particular material. In short, the Department determined that this flyer did not constitute unlawful use of union funds to promote or disparage a candidate for office.

Regarding timing, the Department found that this flyer was originally posted in October 2011, which was one month prior to the Stipulated Settlement and Order resolving the

7

Department's action against TWU. Accordingly, at the time the flyer was created and posted at worksites, the union did not know that a supervised election would occur and could not have posted the flyer as a means of disparaging Stewart's candidacy. While Stewart asserted that this flyer was reposted in April 2012 – one month prior to the delegate election – the Department's investigation did not confirm that this occurred. Rather, it appears that the flyer was initially posted in October 2011, and may have remained on bulletin boards at certain worksites from October through April. As such, the timing does not weigh in favor of a finding that this flyer constituted campaign material.

The flyer presents Local 100's disagreement with the Department's investigative findings that a violation occurred during the 2009 Convention. The tone of the flyer, however, is factual in nature. There is no electioneering. Rather, the union simply reported the results of the Department's investigation and status of the litigation between the Department and TWU. Because the parties had not yet agreed to a supervised election, there was no promotion or disparagement of any candidate. The tone does not weigh in favor of the Department finding that this flyer constituted campaign material.

Finally, the content of the flyer was informative in nature. That is, the flyer informed the Local 100 membership that the Department received and investigated Stewart's election complaint, explained the Department's investigative findings, and explained that the Department was seeking a new election to remedy the violations. The content of the flyer also expressed Local 100's disagreement with the Department's findings. Although Stewart was individually named in the flyer, this alone does not convert an informational flyer into unlawful campaign material – especially given that no election had been scheduled at the time the flyer was created and posted. Naming Stewart was reasonable because the purpose of the flyer was to explain to

the membership the Department's investigation and findings, which were predicated upon Stewart's complaint. Accordingly, the Department concludes that the flyer does not constitute campaign material in violation of section 401(g) of the LMRDA. There was no violation of the LMRDA.

C.      Ainsley Stewart's post-election protest dated May 21, 2012

Allegation: Stewart alleged that Eugene Bleynis, an opposing candidate for the position of Car Maintenance Division Delegate, and fellow Local 100 Executive Board Member Grigory Dunichev campaigned on union time at a Local 100 worksite in violation of section 401(g) of the LMRDA. Specifically, Stewart alleged that at least one Local 100 member, Courtney Jervis, observed Bleynis and Dunichev campaigning to members on May 4, 2012, at the "NYC Transit's 207th Street Overhaul and Inspection Shops." Stewart alleged that Bleynis and Dunichev were on union time while campaigning.

Response: Section 401(g) prohibits the use of union funds to promote a candidate for office, which includes campaigning by an incumbent officer while on union time. 29 C.F.R. § 452.76. During the Department's investigation, Local 100 member Courtney Jervis stated that on May 4, 2012, he observed Local 100 Executive Board Members Dunichev and Bleynis campaigning to workers at the 207th Street Overhaul and Inspection Shops. Jervis would not provide OLMS investigators with any names of other individuals that may have witnessed this campaigning. Despite OLMS' repeated efforts, neither Dunichev nor Bleynis made themselves available for interviews. Assuming that this allegation is true and both Dunichev and Bleynis campaigned at these worksites while on union time, then this would constitute a violation of section 401(g).

Section 402(c)(2) of the LMRDA, however, provides that an election will only be overturned where a violation may have affected the outcome of the election. 29 U.S.C. § 482(c)(2). In this case, the fact that Bleynis was elected as the final Car Maintenance Delegate could not have affected the outcome of the supervised election of the three International officers. First, Stewart was nominated by another local delegate to run for the International Vice President position in the supervised election, and any unlawful campaigning that may have occurred therefore did not affect his ability to run as a candidate for International Vice President. Second, the margin of victory in the supervised election of International officers for the position of International Vice President was 79.43 delegate votes and the margin of victory between the second and third place candidates for International Executive Board was 86.03 delegate votes. The Car Maintenance delegate only carried three (3) delegate votes. Accordingly even if Stewart had been elected the Car Maintenance Delegate, his votes could not have affected the outcome of the supervised election of International Officers. There was no violation of the LMRDA that may have affected the outcome of the election.

After certifying that all delegates were properly elected in accordance with the TWU Constitution and the LMRDA, OLMS proceeded with the supervised election for the three International Officer positions.

## II.    Election of Three International Officers

On April 1, 2012, OLMS mailed a combined notice of nominations and election to TWU delegates, along with a Candidate Nomination Form. After realizing that an error was made on the Candidate Nomination Form, OLMS sent a revised form to all delegates on April 26, 2012. In this revised form, OLMS made it clear that all nominations required that another delegate (rather than a non-delegate member) second the nomination. OLMS required delegates to

nominate candidates in writing by May 14, 2012. In the notice of nominations and election, OLMS explained that a nominations meeting would be held on May 14, 2012, at which nominations could be accepted from the floor. Delegates were invited to participate by conference call, as well as in person. The notice also explained that the election tally would take place on July 2, 2012 at 10:00 a.m.

In total, 19 properly nominated candidates accepted nomination for either the International Vice President position or the two International Executive Board Member positions. During the election period, four candidates mailed campaign literature to TWU delegates. Candidates Thomas Creegan, Charles Ayala, and Ainsley Stewart each mailed campaign literature on June 4, 2012. Candidate Leopold Cox sent a campaign mailer on June 5, 2012, and Ainsley Stewart sent a second campaign mailing on June 27, 2012.

OLMS conducted the supervised election in accordance with the TWU International Constitution. Pursuant to Article XI § 2, TWU local unions are entitled to one delegate for the first 300 or less local union members, and one additional delegate for each additional 300 members. The section also provides that each delegate has one vote for the first 100 members or less, and one additional vote for each additional 100 members. Additionally, TWU local unions may decide to send fewer than the full quota of delegates to the International election.

Pursuant to Article XI § 3 of the TWU International Constitution, delegate representation and voting strength, defined below, shall be based on the TWU local union's membership during the three months prior to the "call of the Convention." In this case, OLMS determined delegate representation based on each TWU local's average membership from December 2011 through February 2012.

11

OLMS conducted this supervised election by mail ballot. OLMS weighted the ballots based on the three-month average membership of each TWU local. OLMS used the average membership of each TWU local to calculate the number of delegates ("delegate representation") and the number of votes ("voting strength") to which each local was entitled. The union's votes were then divided by the number of delegates it chose to send to the International election (many TWU local unions elected to send fewer than their full entitlement of delegates). TWU Local 100 is unique in that each of its 16 divisions historically has been treated as a local union for purposes of determining average membership and delegate representation.

On June 1, 2012, OLMS mailed ballot packages to all delegates. OLMS printed each delegate's voting strength on the delegate's ballot. OLMS found an error on the original ballot package; as a result, a corrected ballot package was sent to all delegates on June 11, 2012. In light of the June 11 mailing of the corrected ballot package, OLMS extended the deadline for returning ballots, to July 9, 2012 at 10:00 a.m.

OLMS received 284 ballots from properly-elected delegates. Thomas Lenane won the International Vice President position by a 79.43 vote margin. Derick Echevarria and Richard Davis won the first and second International Executive Board Member positions, respectively. There was an 86.03 vote margin between the second and third place candidates for the two Executive Board Member positions.

During the supervised International election, OLMS received three pre-election protests dated May 31, July 5, and July 9, 2012, and one post-election protest dated July 18, 2012. All protests were filed by Ainsley Stewart, an unsuccessful candidate for the International Vice President position. The substance of the allegations in these protests is summarized below, followed by the Department's resolution of each allegation.

A.    <u>Ainsley Stewart's pre-election protest dated May 31, 2012</u>

<u>Allegation</u>:  Stewart protested the fact that OLMS did not make a sample ballot available

to members and candidates prior to mailing out ballot packages on June 1, 2012.  Thus, Stewart

did not have access to a final list of candidates prior to the mailing of ballots.

<u>Response</u>:  In a responsive letter, OLMS explained that the LMRDA does not require that

candidates be provided a sample ballot.  Nor does the LMRDA require that a list of candidates be

provided to members prior to sending out ballots.  In this case, OLMS sent the ballot packages

on June 1, 2012 and soon thereafter posted a sample ballot on the TWU website for members and

candidates to view.  The list of candidates and sample ballot could not be completed until May

31, 2012 because nominees had until May 28, 2012 to accept their nomination.  On June 1, 2012,

ballot packages were mailed to all TWU delegates, and on June 5, 2012, a sample ballot was

posted on the TWU website for all members, delegates, and candidates to access.  There was no

violation of the LMRDA.

B.    <u>Ainsley Stewart's pre-election protest dated July 5, 2012</u>

<u>Allegation</u>:  Stewart complained that an original ballot package was sent to delegates on

June 1, 2012 and a corrected ballot package was sent to delegates on June 11, 2012.  Stewart

questioned OLMS' process for insuring that only one ballot per delegate was counted.

<u>Response</u>:  Section 401(c) of the LMRDA requires that there be adequate safeguards to

ensure a fair election.  29 U.S.C. § 481(c); *see* 29 C.F.R. § 452.110.  During the ballot tally,

OLMS arranged all ballots in alphabetical order before they were opened.  The return envelopes

for the ballots sent out June 11, 2012 were labeled "corrected ballot."  If a delegate returned two

ballots, OLMS counted only the corrected ballot and discarded the unopened original ballot.  If a

delegate only returned one ballot, original or corrected, OLMS counted that ballot.  OLMS had

safeguards in place to ensure that no delegate voted with two ballots. Further, OLMS' decision to count either the original or corrected ballot in instances where delegates only returned one ballot ensured that all delegates had an opportunity to participate in the election. There was no violation of the LMRDA.

C.      Ainsley Stewart's pre-election protest dated July 9, 2012

Allegation: Stewart questioned OLMS' process for apportioning the "vote value" or weighted ballots.

Response: Consistent with TWU's interpretation of its constitution, the voting strength and delegate representation for each TWU local and each Local 100 division was calculated based on average membership over a three-month period (December 2011 through February 2012). During the course of the supervised election, OLMS and TWU agreed that TWU locals and Local 100 divisions should not lose voting strength at the International election if they chose not to elect their full complement of delegates. If the TWU local union or Local 100 division chose not to elect all delegates to which it was entitled, then the full voting strength of that local or division (based on a three-month membership average) was divided among the properly-elected delegates for that local or division. For example, if a TWU local or Local 100 division was entitled to five delegates and 15 votes, and five elected delegates participated in the supervised election, then each delegate would cast a ballot worth three votes. If only two elected delegates from the TWU local or Local 100 division participated in the supervised election, then each delegate would cast a ballot worth 7.5 votes (15 votes divided by 2 delegates).

The TWU Constitution permits TWU local unions to elect fewer than its full entitlement of delegates. *See* TWU Constitution, Art. XI § 2(b). OLMS explained the concept of weighted ballots and voting strength to Mr. Stewart during a July 6, 2012 phone call, and also sent him a

14

detailed letter explaining the apportionment of delegates and voting strength for all participating TWU local unions and Local 100 divisions. Further, at the May 14, 2012 candidates' meeting, the OLMS Election Supervisor explained that weighted ballots would be sent to delegates. OLMS' decision to permit TWU locals and Local 100 divisions to send fewer than their full complement of delegates and to divide the voting strength by the number of properly-elected delegates provided the maximum opportunity for TWU members, represented by the delegates, to participate in the supervised International election. There was no violation of the LMRDA.

D.      Ainsley Stewart's post-election protest dated July 18, 2012

Allegation: In this post-election protest, Stewart reasserted numerous allegations raised in his earlier protests. Stewart also raised issues that pre-dated the supervised election. Specifically, Stewart continued to protest TWU's initial determination that he failed to make timely dues payments in 2007.[1]

However, Stewart raised one issue that had not been asserted previously. Stewart argued that he was denied the opportunity to campaign for International Vice President because he was unaware that delegates would be voting using weighted ballots. Specifically, Stewart alleged that he would have campaigned differently had he known that each delegate's ballot was weighted according to the number of members in the TWU local or Local 100 division.

Response: As discussed above, OLMS' decision to use weighted ballots is consistent with the TWU Constitution. A candidate is assumed to know what the union's constitution permits and prohibits. Further, Election Supervisor Allen discussed the use of weighted ballots at the combined nominations and candidates meeting on May 14, 2012, and Stewart attended the May 14, 2012 meeting.

---

[1] While relevant to his underlying election complaint filed with the Department, Stewart's 2007 dues payment history is not relevant to the supervised election at issue.

The Department also concluded that, based on TWU's past practices, Stewart should have known that specific TWU locals and Local 100 divisions carry more votes than others. Stewart is a long-time union member of TWU Local 100, which makes up approximately one-third of the TWU total membership. Accordingly, if Stewart wished to make targeted campaign mailings to specific TWU locals or Local 100 divisions with higher weighted ballots, then he would know that the Local 100 delegates would carry a large portion of the total delegate votes. Instead, Stewart chose to make two campaign mailings to all delegates.

The Department also found that Stewart was not improperly denied election information because no other candidate had more information relating to the delegates' weighted ballots. As discussed above, at the May 14, 2012 candidates' meeting, the OLMS Election Supervisor explained that weighted ballots would be used. Stewart had the same election information and opportunity to campaign as all other candidates.

Finally, OLMS calculated the vote tallies using individual (non-weighted ballots) to determine whether the use of weighted ballots could have affected the outcome of the election. OLMS found that there was no effect. Using weighted ballots, Lenane won the International Vice President position with 209.27 votes (39.02% of total votes), and Stewart finished second with 129.84 votes (34.21% of the total votes). Using individual ballots, Lenane won the election, receiving 69 votes (38.12% of the total votes), and Stewart finished second with 43 votes (23.76% of the total votes). Accordingly, there was no violation of the Act.

16

Based on its investigation of Stewart's election protests, the Department has concluded that TWU's July 9, 2012 election of three International officers, conducted under the Department's supervision, complied with Title IV of the LMRDA and was conducted, insofar as lawful and practicable, in accordance with TWU's Constitution. Therefore, there is no reason to overturn the results of this supervised election.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 16ᵗʰ day of October 2012, in the City of Washington, District of Columbia.

Patricia Fox

_____

Patricia Fox, Chief
Division of Enforcement,
Office of Labor-Management Standards,
United States Department of Labor